396 A.2d 1187

COMMONWEALTH of Pennsylvania, Pennsylvania Human Relations Commission, Appellant,

v.

PITTSBURGH PRESS COMPANY, Appellee.

Supreme Court of Pennsylvania.

Argued Sept. 18, 1978.

Decided Jan. 24, 1979.

Sanford Kahn, Gen. Counsel, Pa. Human Relations Commission, John E. Benjes, Pa. Human Relations Commission, Robert S. Mirin, Harrisburg, for appellant.

Robert H. Shoop, Jr., Jane A. Lewis, Thorp, Reed & Armstrong, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO, LARSEN, JJ.

## OPINION

MANDERINO, Justice.

This appeal is from the order of the Commonwealth Court reversing the order of the Pennsylvania Human Relations Commission (Commission), and declaring unconstitutional that portion of Section 5(g) of The Pennsylvania Human Relations Act, 43 P.S. § 955(g). Section 5(g) prohibits the publication of advertisements for employment expressing the race, color, religious creed, ancestry, age, sex, or national origin of the advertiser. *Pittsburgh Press Co. v. Comm., Human Relations Commission*, 31 Pa.Cmwlth. 218, 376 A.2d 263 (1977).

The circumstances surrounding this appeal are as follows. On March 15, 1975, the Commission charged the Pittsburgh Press Company (Press) with "maintain[ing] a pattern and practice of aiding and abetting the doing of an unlawful discriminatory act" in violation of Section 5(e) of The Pennsylvania Human Relations Act. According to the Commis-

sion, the Press violated Section 5(e) of the Act by publishing "situation wanted" advertisements alleged to be unlawful under Section 5(g) because the ads identified the advertiser's sex, race, religion, or age.

The Pittsburgh Press is a newspaper of general circulation throughout the greater Pittsburgh metropolitan area. The "situation wanted" section of the Press' classified advertisements provides a vehicle for persons seeking employment to describe themselves, their job qualifications, and the kind of employment they are seeking. The Press accepts and publishes these ads exactly as submitted by the advertisers.

On June 27, 1975, following an investigation from which the Commission determined that there was probable cause to credit the allegations contained in the complaint referred to above, the Commission issued a final order requiring the Press to cease and desist from publishing "situation wanted" advertisements, the contents of which are prohibited by Section 5(g).

On appeal, the Commonwealth Court reversed the Commission's final order, and ruled that Sub-section 5(g) was unconstitutional. We granted the Commission's petition for allowance of appeal, and this appeal followed.

The Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, § 1, as amended 43 P.S. §§ 951, et seq., establishes it as

". . . the public policy of this Commonwealth to foster the employment of all individuals in accordance with their fullest capacities regardless of their race, color, religious creed, ancestry, handicap or disability, use of guide dogs because of blindness of the user, age, sex, or national origin, and to safeguard their right to obtain and hold employment without such discrimination, to assure equal opportunities to all individuals and to safeguard their rights at places of public accommodation and to secure commercial housing regardless of race, color, religious creed, ancestry, sex, handicap or disability, use of guide dogs because of blindness of the user or national origin."

To further this public policy, Section 5 of the Act makes certain discriminatory employment practices unlawful. 43 P.S. § 955(a) through (j). Among other things, in 5(g), the Act makes it unlawful employment discrimination

"[f]or any individual seeking employment to publish or cause to be published any advertisement which specifies or in any manner expresses his race, color, religious creed, ancestry, age or national origin, or in any manner express-es a limitation or preference as to the race, color, religious creed, ancestry, age, sex or national origin of any prospec-tive employer." 43 P.S. § 955(g).

Section 5(e) also makes it unlawful

"[f]or any person, whether or not an employer, employ-ment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, . . .."

The Commission found that by accepting and presenting "situation wanted" advertisements which included refer-ences to the criteria declared unlawful by Section 5(g), the Press had "aided and abetted" the unlawful employment practice proscribed by that section, the Press was therefore found to be in violation of Section 5(e).

The Commonwealth Court recognized that the advertise-ments which formed the basis of the Commission's complaint clearly violated Section 5(g):

"An indication of the type of advertisement found by the Commission to violate Section 5(g) can be ascertained from the specific examples set forth in the Hearing Pan-el's findings of fact. These examples were drawn from stipulated exhibits which included the Press' 'Situation Wanted' columns from Sunday, June 1, 1975 to Thursday, June 26, 1975:

'COLLEGE GRAD—Born again Christian with Bache-lor's Degree and seven yrs. sales and marketing mgmt. experience seeking work with Christian business or or-ganization . . . .'

'White woman—desires day work, office cleaning.'

'Parolee—White needs employment to be released. Licensed steam boiler and engineer . . ..'

'Salesman—Age 30, looking for career in Pittsburgh, start immediately, 15 years sales experience . . ..'

'What can I do for you? Recent college grad, good looking, twenty-five years old, B.S. in Business Administration, seeks entry level management position.'

'Man—mature, accounting, bookkeeping, office management, desires position in these or related fields.'

It is obvious at a glance that the contents of these advertisements are in contravention of the letter of Section 5(g)."

(Footnotes omitted.) 31 Pa.Cmwlth. at 223, 376 A.2d at 265.

The Press did not contend otherwise before the Commonwealth Court, nor does it so contend here. The Press argues, however, that Section 5(g) unlawfully infringes on First Amendment rights. We agree with the Commonwealth Court that the advertiser's rights, as guaranteed by the First Amendment to the United States Constitution, are improperly restricted by the prohibition of Section 5(g). We therefore affirm the order of the Commonwealth Court.

■ The Press did not contend before the Commonwealth Court that the state may not prohibit discriminatory employment practices. It argued, however, that the restriction on freedom of expression contained in Section 5(g) is not necessary to promote that legitimate state objective. We agree with the Press that the Commission has not shown that the prior restraint of Section 5(g) is necessary to promote this legitimate state interest. The Commission argued that this case is controlled by *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (Press I). The Press argues that in light of more recent pronouncements of the United States Supreme Court, *Press I* is no longer viable law. We need not decide this point, however, because unlike the situation in *Press I*, what the Commission seeks to do in this case is to restrict the expression of the advertiser itself,

rather than to restrict the unlawful activity of employment discrimination. While it held that legitimate regulation of an unlawful activity may incidentally effect an advertiser's right to freedom of expression, *Press I* does not stand for the proposition that prior restraint may be imposed on commercial speech even though that speech does not propose an illegal transaction.

The United States Supreme Court has, of course, said that it is permissible to regulate commercial advertising in some ways: "[a]dvertising that is false, deceptive, or misleading . . . is subject to restraint" *Bates v. State Bar of Arizona,* 433 U.S. 350, 383, 97 S.Ct. 2691, 2708, 53 L.Ed.2d 810, 835 (1977); *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); as is purely commercial advertising concerning transactions that are themselves illegal, *Bates v. State Bar of Arizona, supra; Press I, supra.* Similarly, reasonable restrictions may be placed upon the time, place, and manner of advertising *Virginia Pharmacy Board, supra*; and special restrictions may be allowable with regard to advertising on the electronic broadcast media, *cf. Capital Broadcasting Co. v. Mitchell,* 333 F.Supp. 582 (D.C.1971), *aff'd sub nom. Capital Broadcasting Co. v. Acting Attorney General,* 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972).

The restriction imposed by Section 5(g), however, goes directly to the advertiser's right to freely express his or her job qualifications, abilities, personal experience, or educational history. In *Press I,* the employer's placement of "Help-wanted" containing sex preference designations constituted an act of illegal sex discrimination in the hiring of personnel. As a result, the Supreme Court said in *Press I,* that

"[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic

activity." 413 U.S. at 389, 93 S.Ct. at 2561, 37 L.Ed.2d at 679.

■ In contrast to the advertising employer's illegal, sex-based, employment discrimination in *Press I,* in the instant case the advertisers are prospective employees proposing commercial transactions—their own employment—which are not illegal. By its terms, the Act applies to employers, and those who aid and abet employers to practice employment discrimination. In *Press I* the Act clearly proscribed the underlying activity—sex based discrimination by the employer—and by providing sex-designated Help-wanted columns in its classified advertising section, the Press directly aided and abetted such employers' practice of sex based employment discrimination. Indeed, the Press did not challenge the illegality of the underlying acts in *Press I.* In the present case, the "situation wanted" ads proposed no illegal transactions, they simply ask that prospective employers hire the respective individual advertisers. The prospective *employees'* use of prohibited employment criteria in an advertisement cannot reasonably be said to aid an employer who might be predisposed to utilize such forbidden criteria. Knowledge of such forbidden criteria—age, sex, race, color, etc.,—is readily obtainable by the employer simply by scheduling a pre-employment interview, or by requesting submission of an employment resume. Any effect that enforcement of Section 5(g) might have on reducing employment discrimination made illegal by Section 5(e) is thus too speculative to justify Section 5(g)'s direct restriction on the advertiser's freedom of expression.

■■ As was stated by the United States Supreme Court in *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 92 fn. 6, 97 S.Ct. 1614, 1618, fn. 6, 52 L.Ed.2d 155, 161 fn. 6 (1977):

"After *Virginia Pharmacy Bd.* [*v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)] it is clear that commercial speech cannot be banned because of an unsubstantiated belief that its impact is detrimental."

In *Linmark,* the record failed to support the township's assumption that proscribing the placement of "for sale" signs in front of township homes would reduce public awareness of realty sales and thereby decrease public concern over selling. Likewise, in the instant case, the record fails to establish the statutory assumption contained in 5(g) that because of the revelation of supposed illegal employment criteria contained in the prohibited "situation wanted" ads, employers would be more likely to base their hiring decisions on such illegal criteria.

Order of the Commonwealth Court is affirmed.

POMEROY, former J., did not participate in the decision of this case.

ROBERTS, J., filed a concurring opinion.

NIX, J., filed a dissenting opinion.

ROBERTS, Justice, concurring.

In my view, Section 5(e) of the Human Relations Act,[1] 43 P.S. § 955(e) (1964),[2] insofar as it authorizes the Pennsylvania Human Relations Commission's order directing the Pittsburgh Press to cease and desist publication of "situation wanted" advertisements, is unconstitutional under article I, section 7 of the Pennsylvania Constitution.[3] As Mr. Justice Stewart observed:

"If government can dictate the layout of a newspaper's advertising pages today, what is there to prevent it from dictating the news pages tomorrow? . . .

1. Act of October 27, 1955, P.L. 744, as amended.

2. § 5(e) makes it unlawful "[f]or any person . . . to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . .."

3. Pa.Const., art. I, § 7, provides:
   "[T]he printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. . . ."

[T]he constitutional guarantee of a free press is more than precatory. . . . [I]t is a clear command that government must never be allowed to lay its heavy editorial hand on any newspaper in this country."

*Pittsburgh Press Company v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 403–4, 93 S.Ct. 2553, 2568 (1973) (Stewart, J., dissenting, joined by Douglas, J., and specially joined by Blackmun, J.). See generally, *William Goldman Theatres v. Dana,* 405 Pa. 83, 173 A.2d 59 (1961) (Pa.Const. art. I, § 7 bars prior restraints). The Commonwealth Court properly reversed the order of the Pennsylvania Human Relations Commission. I therefore join the Court's affirmance.

NIX, Justice, dissenting.

In *Pittsburgh Press Co. v. Human Relations Commission,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (Press I), the United States Supreme Court held an order prohibiting a newspaper from publishing sex-designated advertisements by employers offering employment not to be violative of the first amendment of the federal constitution. Today, a majority of this Court has found the prohibition of situations wanted advertisements identifying the race, color, religious creed, age and sex of the applicant under circumstances prohibited by the Human Relations Act, Act of Oct. 27, 1955, 43 P.S. § 951, *et seq.* (Supp.1978–79), P.L. 744, *as amended,* to be impermissible under the first amendment. To reach this startling result, the majority has given *Press I* an unwarrantedly narrow interpretation and has read into the recent decision of the United States Supreme Court in the commercial speech area unjustified implications. The majority in its zeal to extend the protection to be given commercial speech, totally ignores this Commonwealth's strong commitment to an egalitarian society. *See e. g. Pa.Const.* Art. I § 28. I therefore must express my most vehement disagreement.

In *Press I,* the United States Supreme Court avoided the level of protection commercial speech should be accorded by noting:

Whatever the merits of this contention may be in other contexts, it is unpersuasive in this case. Discrimination in employment is not only commercial activity, it is *illegal* commercial activity under the Ordinance. We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes. Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned "Narcotics for Sale" and "Prostitutes Wanted" rather than stated within the four corners of the advertisement.

The illegality in this case may be less overt, but we see no difference in principle here. Sex discrimination in nonexempt employment has been declared illegal . . .

413 U.S. at 388, 93 S.Ct. at 2560 (emphasis in original) (citations omitted)

The Pennsylvania Human Relations Act, *supra,* announced unequivocally that the practice or policy of discrimination in employment by reason of race, color, religious creed, ancestry, age, sex or national origin is violative of the public policy of this Commonwealth. Section 5 of the Act specifies those practices which have been declared illegal in an effort to eradicate the evils of discrimination. Section 5(g) prohibits an individual seeking employment from attempting to influence the employment decision by supplying information relating to those factors or qualities which have been proscribed in making such a judgment. Section 5(e) prohibits a third party from aiding and abetting the transmittal of the prohibited information for the purpose of influencing the employment decision. It is conceded that the ads which form the basis of this lawsuit were in violation of Sections 5(g) and (e) and therefore illegal under the law of this Commonwealth. Notwithstanding the fact that it has been conceded that the publishing of these ads *was illegal commercial activity* under the terms of the Act, the majority seeks to support its result by finding that the advertiser's

rights, as guaranteed by the freedom of expression amendment of the federal constitution, have been improperly curtailed by the mandate of Section 5(g).

While recognizing that a state may prohibit discriminatory employment practices, the majority argues that the restriction of freedom of expression accomplished by Section 5(g) "is not necessary to promote that legitimate state objective." (Maj. op. p. 1189)  This position ignores the holding and supporting rationale of *Press I.*  In that case, the United States Supreme Court clearly sanctioned the restriction of the advertiser's right to freedom of expression to effectuate a legitimate regulation of an unlawful activity. Moreover, in its latest decisions the United States Supreme Court has reaffirmed the right to restrain commercial advertising that is inimical to the public welfare.  *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

> The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely.  (citation omitted)
>
> Also, there is no claim that the transactions proposed in the forbidden advertisements are themselves illegal in any way.

*Va. Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. at 771–72, 96 S.Ct. at 1830.  (citations omitted).

Here the transactions proposed in the forbidden advertisements are in themselves illegal.  The ads encourage the employer to make the employment decision based upon the prohibited considerations.  The commercial speech being restrained is simply a solicitation for discriminatory hiring. The majority seeks to disguise the illegality by characterizing the content of these ads as a mere expression of the applicants "job qualifications, abilities, personal experience, or educational history."  This gloss does not dismiss the

controlling fact that the qualifications sought to be communicated are not legitimate concerns in the employment decision and are solely for the purpose of encouraging discriminatory hiring decisions. It is not simply a request to be hired as the majority contends, rather it seeks to pollute the hiring decision by introducing the prohibited considerations.

Commercial speech is only distinguishable by its content and the United States Supreme Court has recognized that the first amendment protections should not be withdrawn from it simply because it proposes a mundane commercial transaction. Here, however, the restraint is not being imposed because of the commercial character of the message, but rather the illegal transaction it proposes.

The majority perceives a distinction in the nature of the transactions here and that encountered in *Press I*. I confess that I am unable to comprehend that distinction. In both instances the illegal activity condemned was discriminatory employment. In *Press I,* the regulation was directed to the conduct of the prospective employer. In this appeal, the conduct of the prospective employe is being regulated. Both regulations were directed to the same end, i. e. discriminatory hiring. Further, both regulations did not impinge upon the free flow of commercial information necessary to make the employment decision. The only information restrained was information not lawfully relevant to the proposed commercial transaction.

Finally, in both *Press I* and the instant appeal, we are concerned with the right of the newspaper to publish the information. There is obviously no greater right derived by the newspaper to communicate the expressions of a potential employe than its right to disseminate the needs of a potential employer. I am therefore of the view that the employe's rights of freedom of expression under the first amendment have not been abridged by the state's legitimate exercise of its police power in an attempt to eradicate one of the most pervasive and elusive evils in our society today.